**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SEWELL COAL COMPANY,
Petitioner,

v.

BESSIE M. BRAGG, survivor of

No. 96-2512

Ronald Bragg; DIRECTOR, OFFICE OF
WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF
LABOR,
Respondents.

On Petition for Review of an Order
of the Benefits Review Board.
(96-394-BLA)

Argued: June 6, 1997

Decided: July 11, 1997

Before HAMILTON and LUTTIG, Circuit Judges, and
GARBIS, United States District Judge for the
District of Maryland, sitting by designation.

_____

Vacated and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Steele Mattingly, JACKSON & KELLY, Mor-
gantown, West Virginia, for Petitioner. G. Todd Houck, MOLER,
STATON & HOUCK, Mullens, West Virginia, for Respondents. **ON**

**BRIEF:** Kathy L. Snyder, JACKSON & KELLY, Morgantown, West Virginia, for Petitioner.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

Appellant Sewell Coal Company appeals from the Benefits Review Board's affirmance of the Administrative Law Judge's award of benefits pursuant to the Black Lung Benefits Act, 30 U.S.C. § 901 et seq. to appellee Bessie Bragg, the widow of Sewell's former employee Ronald Bragg. Because the ALJ failed to adequately explain its reasons for crediting certain witnesses and discrediting others, we vacate the Board's decision and remand with instructions to the Board to remand to the ALJ for further proceedings.

Ronald Bragg worked in the coal mines for Sewell from 1969 to 1984; he died on February 2, 1992. The cause of his death is disputed, with Bessie Bragg, his widow, claiming it to be the result, at least in part, of his work in the coal mines, and Sewell arguing that some other cause, possibly his exposure to moldy hay while working on a landscaping project long after he had left Sewell's employ and after which he developed pneumonia, led to Ronald Bragg's death. Consequently, Bessie Bragg brought this claim for benefits under the Black Lung Benefits Act, arguing that pneumoconiosis, or black lung disease, was a substantially contributing cause of her husband's death.

At the administrative hearing before the ALJ, evidence was presented both in favor of and against Bessie Bragg's claim that her husband's work in the coal mines contributed to his death. As the ALJ noted,

> the following doctors thought [that Ronald Bragg] had pneumoconiosis: Drs. Andrada (who signed the death certifi-

2

cate), Rasheed [who performed the autopsy on Ronald Bragg], Gaziano, Ranavaya and perhaps Fino[,]

J.A. at 220-21, and that

the doctors who thought [that Bragg] did not have pneumoconiosis were the state Occupational Pneumoconiosis Board and Drs. Hansbarger, Kleinerman, Caffrey, Naeye, Hutchins and Bush.

J.A. at 221.

Based upon this conflicting evidence, it is possible that substantial evidence would support a ruling either in favor of Bessie Bragg or in favor of Sewell. That, however, is not the issue before us. Rather, as we have repeatedly held, even where an ALJ's decision would otherwise be supported by substantial evidence, that decision cannot stand unless it is accompanied by explicit reasoning from which we can discern that the ALJ's decision is not arbitrary and capricious. Thus, in Arnold v. Secretary of Health, Education and Welfare, 567 F.2d 258 (4th Cir. 1977), we reversed the ALJ's denial of benefits, finding that the ALJ had failed to adequately explain the basis for its decision:

Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

Thus, we hold that the Secretary, in determining an applicant's entitlement to black lung benefits, must consider all relevant evidence, . . . and must indicate explicitly that such evidence has been weighed and its weight.

567 F.2d at 259 (citations omitted). And, in Jordan v. Califano, 582 F.2d 1333 (4th Cir. 1978), we reiterated:

Before we determine the substantiality of the evidence to support the administrative determination, we first ascertain

3

whether the Secretary has discharged his duty to consider all relevant evidence. A bald conclusion, unsupported by reasoning or evidence, is generally of no use to a reviewing court, except in the very rare instance when a case is so one-sided as to be obvious. This case is not within the exception. Moreover, conclusory administrative determinations may conceal arbitrariness.

582 F.2d at 1335.

Here, the ALJ credited the testimony of the autopsy prosector over that of the non-examining pathologists, simply because the prosector, unlike the non-examining doctors, had the opportunity to perform a gross examination of Ronald Bragg's body; the ALJ, however, nowhere explained why such gross examination made the prosector's testimony more credible. Thus, in its original opinion, the ALJ recited in detail the various conflicting testimony over the cause of Ronald Bragg's death, but then explained that because Dr. Rasheed, the autopsy prosector, and Dr. Andrada, the pathologist who signed the death certificate, "actually examined the miner immediately after his death[,] . . . [they were] more credible tha[n] . . . the Employer's doctors who did not examine the miner, but only reviewed his [medical] records." J.A. at 221. Finding this explanation inadequate, the Board vacated the ALJ's decision, stating that, in addition to "first determin[ing] the credibility and weight of the reviewing pathologists' contrary opinions before according deference to the opinion of the autopsy prosector," J.A. at 228 (emphasis added), the ALJ was required to "provide an adequate rationale for concluding that the prosector's gross examination provide[d] an advantage over the opinions of the reviewing pathologists," J.A. at 228. On remand, however, the ALJ merely stated that it had "consider[ed] all the medical evidence, both pro and con . . . [and] assigned greater weight to the opinion of Dr. Rasheed . . . [because] Dr. Rasheed examined [Ronald Bragg] and performed the autopsy while the reviewing pathologists did not examine [him] and only reviewed his medical records and slides." J.A. at 225. The Board affirmed, J.A. at 235, and Sewell appealed.

It is possible that the ALJ might have believed that the testimony of examining pathologists is always more credible than the testimony of non-examining pathologists on the issues of both the existence of

4

pneumoconiosis and whether the pneumoconiosis contributed to the coal miner's death; such belief on the existence of pneumoconiosis, however, would have at least been drawn into question by the testimony of the examining pathologist in this case. As Dr. Rasheed explained, the determination of whether pneumoconiosis is present depends largely on a microscopic examination of the decedent's organs, as "[s]ometimes it[ ] [is] difficult to evaluate the[ ] features [of pneumoconiosis] on a gross diagnosis. That's why sometimes you will find quite a bit of discrepancies between a preliminary gross diagnosis and a final diagnosis when it comes to pneumoconiosis." J.A. at 154-55. And, as Dr. Rasheed herself confirmed, the non-examining pathologists in this case had available to them all of the information upon which she (Dr. Rasheed) based her conclusion, and, consequently, the pathologists had sufficient information to evaluate her conclusion as well as to form their own:

> Q. In your report, d[id] you describe all of your findings . . . both gross and microscopic? And then d[id] you preserve all of the slides for other pathologists.
>
> A. Yes.
>
> Q. As the original prosector, do you have any maybe secret findings, something you haven't described in your report or preserved on the slides?
>
> A. I should hope not. Why would I want to keep anything secret.
>
> Q. In view of that, would you say that someone who is reviewing your report or reviewing the autopsy slides, the microscopic slides, would be able to see and know everything that you'd know from doing the autopsy yourself?
>
> A. They would see everything I see and they should . . . be able to see everything I see, but people see and describe things differently. I mean, I don't think you can get two pathologists to say the same thing on any single slide . . . .

5

Q. And aside from that fact that pathologists disagree, its your testimony that you've provided everything in your written report that you . . . ascertained?

A. Yes.

J.A. at 157-59.

From the foregoing, it appears at least arguable, though perhaps not unassailable, that the non-examining pathologists in this case were in at least as good a position to evaluate whether Ronald Bragg had pneumoconiosis as it is defined in the regulations, see 20 C.F.R. § 718.201. However, Dr. Rasheed also noted that, as the autopsy prosector, she was in a better position than the non-examining pathologists to evaluate the destruction caused by Ronald Bragg's pneumoconiosis. Therefore, it would have been permissible for the ALJ to rely on Dr. Rasheed's opinion as the autopsy prosector to resolve the conflict over the cause of Ronald Bragg's death but not to resolve the conflict over the existence of pneumoconiosis in Ronald Bragg's lungs in the first instance.*

We need not, however, decide this issue of whether the ALJ should have accorded the non-examining pathologists more credit than it actually did, or Dr. Rasheed less; that is not our concern. Rather, our concern is with the ALJ's failure to confront this and other testimony found throughout the record, and to explain the basis for his belief that the examining pathologist in this case was in a better position to determine both the existence of pneumoconiosis in Ronald Bragg's lungs and whether that pneumoconiosis, if it existed, contributed to Ronald Bragg's death, beyond the fact that only the examining pathologist had the opportunity to perform a gross examination of the decedent's body. Without such explanation, we cannot determine whether the ALJ's bald conclusion was based on an arbitrary belief that examining pathologists are necessarily better positioned to deter-

_____

*Even Dr. Kleinerman, one of the experts relied on by Sewell, noted the existence of a single nodule of silicosis, which is sufficient to meet the definition of pneumoconiosis under the applicable regulation, see 20 C.F.R. § 718.210.

6

mine cause of death, or on a belief arrived at through consideration of the competing evidence on the issue in this case.

Accordingly, we vacate the Board's decision, and remand to the Board with instructions to remand the case to the ALJ for further proceedings consistent with this opinion.

<u>VACATED AND REMANDED</u>

7